Moore, J., Dissenting.
I respectfully dissent. Due to modern DNA testing, a nonmarital child can easily establish whether he or she is a "child" of a decedent (even after the parent's death). But under the majority's interpretation of the wrongful death statute, a nonmarital child must overcome burdens to establish standing that are not required of other children. The nonmarital child must rely on the father to declare parentage during his lifetime, or rely on the mother to fortuitously file a paternity action before the father's death. These burdens are not substantially related to an important government purpose, given the ready access and reliability of modern DNA testing. Thus, I would hold that the wrongful death statute, as it is being applied here, violates the equal protection clause.
I would find that under these circumstances the plain meaning of the word "children" in the wrongful death statute should control. There is a conclusive DNA
*891 test that proves the decedent Amine Britel was the father of A.S. In this case it is not necessary to rely on intestacy laws in order to interpret the wrongful death statute. (See Estate of Cleveland (1993) 17 Cal.App.4th 1700, 1705-1706, 22 Cal.Rptr.2d 590 [the purpose of intestacy laws is to correctly determine intestate succession].) Thus, I would hold that A.S. has standing to sue for her father's wrongful death.
Equal Protection
Persons may not be denied equal protection of the laws under both the state and federal Constitutions. ( Cal. Const., art. I, § 7 ["A person may not be ... denied equal protection of the laws"]; U.S. Const., 14th Amend. ["No State shall ... deny to any person within its jurisdiction the equal protection of the *307 laws"].) Because the two constitutional provisions guarantee substantially similar rights, courts generally evaluate equal protection claims under the same analytical framework. ( Garcia v. Four Points Sheraton LAX (2010) 188 Cal.App.4th 364, 382, 115 Cal.Rptr.3d 685.)
When challenged under the equal protection clause, laws are subject to one of three levels of "scrutiny": strict scrutiny, intermediate scrutiny, or rational basis review. Strict scrutiny applies when a law discriminates against a suspect class, such as a racial group, or interferes with fundamental rights. (See, e.g., Grutter v. Bollinger (2003) 539 U.S. 306, 326, 123 S.Ct. 2325, 156 L.Ed.2d 304.) Intermediate scrutiny applies when a law discriminates against other suspect classes, specifically nonmarital children and women (or men). (See Clark v. Jeter (1988) 486 U.S. 456, 461, 108 S.Ct. 1910, 100 L.Ed.2d 465 ( Clark ).) Rational basis review applies in all other cases. ( Fitzgerald v. Racing Association (2003) 539 U.S. 103, 106-107, 123 S.Ct. 2156, 156 L.Ed.2d 97.)
In order to withstand strict scrutiny, the government must prove that the law is necessary to achieve a compelling government purpose. ( Palmore v. Sidoti (1984) 466 U.S. 429, 432-433, 104 S.Ct. 1879, 80 L.Ed.2d 421.) Under intermediate scrutiny, the government must prove that the law is substantially related to an important government purpose. ( Craig v. Boren (1976) 429 U.S. 190, 218, 97 S.Ct. 451, 50 L.Ed.2d 397.) Under rational basis review, courts will uphold a law if it is rationally related to a legitimate government purpose. ( Pennell v. San Jose (1988) 485 U.S. 1, 14, 108 S.Ct. 849, 99 L.Ed.2d 1.) Laws may be challenged both as written (a facial challenge) and as applied. ( Tobe v. City of Santa Ana (1995) 9 Cal.4th 1069, 1114, fn. 4, 40 Cal.Rptr.2d 402, 892 P.2d 1145.)
Heightened scrutiny is certainly appropriate when a law discriminates against nonmarital-formerly "illegitimate"-children. (See Weber v. Aetna Casualty & Surety Co. (1972) 406 U.S. 164, 175-176, 92 S.Ct. 1400, 31 L.Ed.2d 768.) "The status of illegitimacy has expressed through the ages society's condemnation of irresponsible liaisons beyond the bonds of marriage. But visiting this condemnation on the head of an infant is illogical and unjust. Moreover, imposing disabilities on the illegitimate child is contrary to the basic concept of our system that legal burdens should bear some relationship to individual responsibility or wrongdoing. Obviously, no child is responsible for his birth and penalizing the illegitimate child is an ineffectual-as well as an unjust-way of deterring the parent." (Ibid ., italics added, fn. omitted.)
*308 Because modern DNA testing can readily establish parentage, laws that discriminate against nonmarital children are now *892 seldom justified.[1] (See, e.g., Clark , supra , 486 U.S. 456, 108 S.Ct. 1910.) In Clark , a mother filed a support claim on behalf of her nine-year-old child. ( Id . at p. 457, 108 S.Ct. 1910.) In the complaint, the mother named respondent as the father. "The court ordered blood tests, which showed with a 99.3% probability that" the respondent was the father. Pennsylvania courts dismissed "the complaint on the ground that it was barred by a 6-year statute of limitations for paternity actions." ( Id . at p. 458, 108 S.Ct. 1910.) The United States Supreme Court reversed: "To withstand intermediate scrutiny, a statutory classification must be substantially related to an important governmental objective. Consequently we have invalidated classifications that burden illegitimate children for the sake of punishing the illicit relations of their parents, because 'visiting this condemnation on the head of an infant is illogical and unjust.' " ( Id . at p. 461, 108 S.Ct. 1910.)
Under the Pennsylvania law, "an illegitimate child must prove paternity before seeking support from his or her father, and a suit to establish paternity ordinarily must be brought within six years of an illegitimate child's birth. By contrast, a legitimate child may seek support from his or her parents at any time." ( Clark , supra , 486 U.S. at p. 457, 108 S.Ct. 1910.) On review, the Supreme Court found "that increasingly sophisticated tests for genetic markers permit the exclusion of over 99% of those who might be accused of paternity, regardless of the age of the child. [Citation.] This scientific evidence is available throughout the child's minority, and it is an additional reason to doubt that Pennsylvania had a substantial reason for limiting the time within which paternity and support actions could be brought." ( Id. at p. 465, 108 S.Ct. 1910.) Further, the Court reasoned that: " 'The unwillingness of the mother to file a paternity action on behalf of her child, which could stem from her relationship with the natural father or ... from the emotional strain of having an illegitimate child, or even from the desire to avoid community and family disapproval, may continue years after the child is born.' " ( Id . at p. 463, 108 S.Ct. 1910.) The Court concluded that the paternity statute, which resulted in the disparate treatment of nonmarital children "does not withstand heightened scrutiny under the Equal Protection Clause." ( Id . at p. 465, 108 S.Ct. 1910.)
Here, had Jacqueline Stennett (hereinafter "Jackie," A.S.'s mother) and Britel been married when A.S. was born, there is no question that A.S. would *309 have standing to file a cause of action under the wrongful death statute. Due to modern DNA testing, we know that A.S. is unquestionably Britel's "child." ( Code. Civ. Proc., § 377.60.) "In California, an action for wrongful death is governed solely by statute, and the right to bring such an action is limited to those persons identified therein." ( Jackson v. Fitzgibbons (2005) 127 Cal.App.4th 329, 334-335, 25 Cal.Rptr.3d 478.)
However, under the majority's interpretation and application of the wrongful death statute, A.S. is subject to burdens in order to establish standing solely because *893 she is a nonmarital child. According to the majority: "Our holding would be different if Jackie had obtained a court order declaring paternity during Britel's lifetime. But Jackie knowingly elected not to obtain a paternity declaration in the 10 years after A.S. was born. Had Jackie done so, A.S. certainly would have standing to sue for Britel's wrongful death. [Citations.] A.S. also would have standing if Britel had died before A.S. was born, and if A.S. established paternity by clear and convincing evidence." (Maj. opn., ante , at pp. 883.)
In California, "the purpose of the wrongful death statute ... is to compensate for the loss of companionship and for other losses to specified persons as a result of the decedent's death." ( Jackson v. Fitzgibbons , supra , 127 Cal.App.4th at p. 335, 25 Cal.Rptr.3d 478.) But I do not think that placing the burden on Alexandra to rely on her father to declare parentage, or her mother to fortuitously file a paternity action before the father's death, is substantially related to that legislative purpose. (See Clark , supra , 486 U.S. at p. 463, 108 S.Ct. 1910 [an unwed mother may be unwilling to file a paternity action].) Indeed, were we to find that Alexandra has standing to file a wrongful death action, she would ultimately have to prove damages, consistent with the Legislature's intent. (See CACI No. 3921.)
Further, the conclusiveness and availability of DNA testing is "an additional reason" to doubt that California has an important governmental interest in placing burdens on nonmarital children that it does not place on other children. (See Clark , supra , 486 U.S. at p. 465, 108 S.Ct. 1910.) These additional standing burdens for nonmarital children are not necessary to screen frivolous or illicit wrongful death claims. In sum, I would respectfully find that the majority's interpretation of the wrongful death statute, which results in the discrimination of nonmarital children, is not substantially related to an important government purpose. (See Craig v. Boren , supra , 429 U.S. 190, 97 S.Ct. 451.)
Plain Meaning Interpretation
Generally, when interpreting a statute we start with an examination of the language of the statute itself. ( *310 Mercer v. Department of Motor Vehicles (1991) 53 Cal.3d 753, 763, 280 Cal.Rptr. 745, 809 P.2d 404.) If the statute's meaning is plainly understood, the language controls. ( Security Pacific National Bank v. Wozab (1990) 51 Cal.3d 991, 998, 275 Cal.Rptr. 201, 800 P.2d 557.) That is, if the meaning of the statute is clear and unambiguous, we need not refer to its legislative history or other extraneous interpretive aids. ( Long Beach Police Officers Assn. v. City of Long Beach (1988) 46 Cal.3d 736, 743, 250 Cal.Rptr. 869, 759 P.2d 504.)
"The Legislature's chosen language is the most reliable indicator of its intent because ' "it is the language of the statute itself that has successfully braved the legislative gauntlet." ' [Citations.] We give the words of the statute 'a plain and commonsense meaning' unless the statute specifically defines the words to give them a special meaning. [Citations.] If the statutory language is clear and unambiguous, our task is at an end, for there is no need for judicial construction. [Citation.] In such a case, there is nothing for the court to interpret or construe." ( MacIsaac v. Waste Management Collection & Recycling, Inc. (2005) 134 Cal.App.4th 1076, 1082-1083, 36 Cal.Rptr.3d 650.)
Under California's wrongful death statute, "children" have standing to file: "A cause of action for the death of a person caused by the wrongful act ... of another ...." ( Code Civ. Proc., § 377.60, subd. (a).) The word "children" is not defined *894 within the statute, but the word "children" is simply the plural form of the word "child." (Meriam-Webster's 11th Collegiate Dict. (2007) p. 214, cols. 1-2.) The word "child" is defined as the "son or daughter of human parents." (Ibid .; see also Wasatch Property Management v. Degrate (2005) 35 Cal.4th 1111, 1121-1122, 29 Cal.Rptr.3d 262, 112 P.3d 647 ["When attempting to ascertain the ordinary, usual meaning of a word, courts appropriately refer to the dictionary definition of that word"].)
Here, it is undisputed that A.S. is Britel's "child." Therefore, she has standing to file a cause of action for his alleged wrongful death under the plain meaning of the statute. The majority's holding that the word "children" can be interpreted by reference to intestacy laws is, as a general proposition, well supported by case law. (See, e.g., Cheyanna M. v. A.C. Nielsen Co . (1998) 66 Cal.App.4th 855, 864-865, 78 Cal.Rptr.2d 335 ["standing to bring a wrongful death action remains linked to the intestacy laws"].) But under these circumstances, I cannot reconcile the majority's interpretation of the wrongful death statute with the equal protection guarantees for nonmarital children.

Equal protection analysis is not static, courts can properly take into account changing circumstances. (See National Coalition for Men v. Selective Service System (S.D. Tex. 2019), 355 F.Supp.3d 568, 582 ["while historical restrictions on women in the military may have justified past discrimination, men and women are now 'similarly situated for purposes of a draft or registration for a draft' "]; see also Obergefell v. Hodges (2015) --- U.S. ----, 135 S.Ct. 2584, 2589, 192 L.Ed.2d 609 ["When new insight reveals discord between the Constitution's central protections and a received legal stricture, a claim to liberty must be addressed"].)