Filed 4/26/13  In re M.L. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re M. L., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E057367 |
| Plaintiff and Respondent, | (Super.Ct.No. J234563) |
| v. | OPINION |
| E. S., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Cheryl C. Kersey, Judge.  Reversed with directions.

Clare M. Lemon, under appointment by the Court of Appeal, for Defendant and Appellant.

Jean-Rene Basle, County Counsel, Jamila Bayati, Deputy County Counsel, for Plaintiff and Respondent.

1

E. S. appeals an order terminating her parental rights to M. L.  She contends that her due process rights were violated by lack of notice that at the selection and implementation hearing, pursuant to Welfare and Institutions Code section 366.26, the San Bernardino County Children and Family Services department (CFS) would recommend adoption as the child's permanent plan.[1]  She also contends that the order must be reversed for failure to comply with the Indian Child Welfare Act (ICWA). (25 U.S.C. § 1901 et seq.)

FACTUAL AND PROCEDURAL HISTORY

When M. L. was 21 months old, E. S. and her boyfriend (who is not M. L.'s father) were arrested on charges involving possession of heroin.  Mother admitted to the arresting officer that she was under the influence of heroin when she was arrested.  M. L. was detained and placed with his maternal grandmother, L. S.  M. L.'s father, who had an extensive criminal record and an extensive history of drug abuse, was in prison at the time of M. L.'s detention.

A petition pursuant to section 300 was filed on August 27, 2010.  It alleged that E. S. had a drug problem which impeded her ability to care for M. L. and that she had failed to protect the child by allowing him to be in a home where there was drug paraphernalia, including "exposed syringe needles with Heroin still in the vials, thus

---

[1] All further statutory citations refer to the Welfare and Institutions Code unless another code is specified.

2

placing the child at extreme risk for serious harm and possible death from drug overdose." It also alleged that E. S. had left M. L. with no provision for support upon her arrest.

The jurisdiction report states that E. S. admitted having a problem with heroin use. She reported that she and her boyfriend, as well as all of their friends, used heroin. In addition, E. S. is bipolar and uses prescribed lithium. At the time of the report, she was also suffering from depression and was using prescribed Xanax. The biological father had "an extremely long history of drugs, alcohol, violence, criminality, and incarceration." He had no relationship with M. L. E. S. recognized that she needed help with her addiction and recognized that rehabilitation was the only way she would get her son back and be able provide for him.

M. L. was healthy and appeared to be developmentally on target. His maternal grandmother, L. S., reported that he was a very happy child and got along well with everyone. The social worker observed that the child and the grandmother were strongly bonded and that the child was doing very well in that placement. She reported that the grandmother was willing to give him a permanent home if reunification failed, but that she hoped E. S. could "turn this around and get clean and sober." E. S. was still incarcerated but was given referrals to appropriate services, and CFS would authorize visits upon her release.

E. S. reported possible Native American ancestry, and CFS initiated notice pursuant to ICWA. The court found that notice had been given as required, and that ICWA does not apply.[2]

An addendum report filed before the jurisdiction/disposition hearing stated that E. S. had been released from jail and was attending drug court. She was living with an aunt, and was complying with all aspects of her program. She reported having good visits with M. L., although not as frequently as she would like because she was extremely busy with her drug classes. M. L. continued to do "extremely well" in his grandmother's care. The social worker had spoken with M. L.'s father. He attributed his alcohol problem to the fact that he had not been able to see his son. However, as the social worker noted, he had had issues with drinking for over a decade. The father had been released from prison on September 17, 2010, but had been rearrested for a parole violation and returned to custody on September 30, 2010. The social worker recommended against reunification services for the father.

A second addendum report stated that the social worker had been informed that E. S. might have been injecting cocaine. She had completed paperwork to require E. S. to engage in random drug testing. E. S. had not yet begun individual counseling as required. The social worker reported that although E. S. was struggling, she continued to make progress in her program, and was "putting forth effort." The father remained incarcerated. He had seen M. L. only once or twice since M. L.'s birth. The social

[2] E. S. contests the finding that notice had been given as required by ICWA.

4

worker stated that it would not benefit M. L. to reunify "with a stranger who presents more risk to the safety and well being of the child."

At the jurisdiction/disposition hearing, the court declared M. L. a dependent and ordered family reunification services for E. S. The father was found to be an alleged father and not entitled to services. M. L. was continued in placement with his maternal grandmother. E. S. was ordered to be in compliance with medication for her bipolar condition and to follow up with her psychiatrist on a regular basis.

The six-month status review report stated that M. L. continued to do well in his placement and that the grandmother and her husband were considering adopting him if E. S. was not able to reunify.[3] E. S. was continuing to work on her case plan, but the social worker expressed a number of concerns. First, E. S. had been arrested twice for failure to drug test (although E. S. reported that she had been unable to urinate because of a medical condition). Second, E. S. was living with her boyfriend and his family. The boyfriend had a serious drug history, and there was information that he was abusing an opiate and that the boyfriend's father was selling marijuana. Third, E. S.'s therapist was concerned that she might relapse. She had a substantial eating disorder and very poor body image, and appeared unable "to not have a male in her life to take care of her." The social worker considered E. S.'s relationship with the boyfriend as "unhealthy and borderline abusive." Nevertheless, E. S.'s prognosis was considered "'guardedly good,'"

---

[3] M. L. was placed with his maternal grandmother. The status review report refers to his "maternal grandparents." It is not clear whether the grandmother's husband is biologically M. L.'s grandfather.

and CFS recommended continuation of reunification services. It noted that E. S. needed to obtain a suitable residence for herself and M. L. and to obtain steady employment.

At the six-month review, the court continued reunification services to E. S., finding her progress to have been moderate.

In the 12-month review report, CFS recommended termination of services and establishing a permanent plan of guardianship for M. L. The social worker reported that E. S. had been compliant and cooperative and that she was currently completing services. However, E. S. had told the social worker that she was not ready to take on the responsibility of caring for M. L. She was still in need of appropriate housing and stable employment, and needed further treatment for her self-image, eating disorder and domestic violence issues. She had discussed guardianship with her mother, L. S., and wanted her mother to obtain legal guardianship of M. L. L. S. reported that she and her husband agreed to obtaining legal guardianship if reunification did not succeed. The social worker stated that because of the bond between mother and son, termination of parental rights would not be in M. L.'s best interest.

At the 12-month review hearing, the court terminated reunification services and set a section 366.26 hearing with the understanding that CFS would limit its permanent plan recommendation to guardianship. M. L.'s attorney agreed to guardianship because she wanted him to stay with his grandmother, to whom he was "very bonded." The grandmother was not willing to adopt him at that point.

On the date set for the section 366.26 hearing, CFS informed the court that it had changed its permanent plan recommendation from guardianship to adoption. The court continued the hearing in order to provide notice of the changed recommendation.

Mother did not appear on the date set for the continued hearing. The court continued the hearing at the request of counsel for the alleged father.

On the next date set for the section 366.26 hearing, E. S. again did not appear.[4] The court terminated parental rights and referred M. L. for adoption.

LEGAL ANALYSIS

1.

BECAUSE THERE IS SUBSTANTIAL EVIDENCE THAT E. S. HAD ACTUAL NOTICE OF THE SECTION 366.26 HEARING, THERE WAS NO VIOLATION OF HER DUE PROCESS RIGHT TO NOTICE

A. *Summary of the Issue*

E. S. contends that she did not receive adequate notice of the continued section 366.26 hearing after CFS informed the court that it would proceed on a recommendation of adoption rather than guardianship.

The issue arose as follows: At the 12-month review hearing on December 5, 2011, the court terminated reunification services and set a permanency planning hearing pursuant to section 366.26. The parties and the court concurred that the hearing would be

---

[4] We discuss the section 366.26 hearings in greater detail below, in connection with E. S.'s contention that she did not receive constitutionally adequate notice of the hearings.

limited to a recommendation for guardianship and that termination of parental rights was not on the table, so to speak. E. S. was present at that hearing. However, the court ordered CFS to "notice parents appropriately" for the section 366.26 hearing, which the court set for April 3, 2012.

E. S. did not attend the hearing on April 3. At that hearing, CFS informed the court that its recommendation of guardianship at the 12-month review hearing was based on the grandmother's unwillingness to adopt at that time. The grandmother, L. S., had changed her mind, however, and CFS intended to proceed instead on a permanent plan of termination of parental rights and adoption. CFS considered adoption by L. S. to be in M. L.'s best interest and "the more appropriate plan," given his age and the greater permanency of adoption. CFS wanted to continue the hearing in order to provide statutorily required notice of the change in recommendation. E. S.'s attorney objected on her behalf to termination.

The court set the continued section 366.26 hearing for August 1, 2012, and ordered CFS to give appropriate notice of the hearing date and the change in the recommendation from guardianship to adoption. The court set a notice review hearing for May 18, 2012.

On May 18, 2012, CFS informed the court that E. S. had been served by substituted service, as shown on the proof of service filed on April 26, 2012. The proof of service stated that service was accomplished by delivering a copy of the notice to the maternal grandmother at her residence in Crestline and by mailing a copy to E. S. at that address. The declaration of due diligence stated that L. S. had informed the server that

8

E. S. lived at that address but was not there at the time. Another proof of service, filed on April 23, 2012, stated that E. S. had been served by certified mail sent on April 16, 2012, to Post Office Box 1396 in Crestline. The certified mail receipt was signed by L. S.

E. S. did not appear at the hearing on August 1, 2012. Her attorney stated that L. S. had told her that E. S. did receive notice of the hearing. The court asked L. S. if she thought mother was going to show up. The grandmother replied, "I don't know she knows [*sic*]. She was served physically and also by mail." The court then continued the hearing to September 19, 2012, in order to allow the father's attorney to arrange to have him transported.

E. S. did not appear at the hearing on September 19. CFS stated that she had been served by substituted service as shown on the proof of service filed April 26, 2012, and E. S.'s attorney stated that she had sent notice to E. S.'s last known address, stating that there would be a hearing on termination of parental rights on September 19, 2012. The hearing proceeded in E. S.'s absence, and the court terminated parental rights and referred M. L. for adoptive placement.

E. S. now contends that she did not receive notice of any of the proceedings after April 3, 2012. She contends that the lack of any notice of a hearing at which her parental rights might be terminated violated her due process right to notice. CFS acknowledges that there is no indication in the record that E. S. was living at her mother's home, and also acknowledges that the mailing address on record for E. S. was Post Office Box 1559 in Crestline, not Post Office Box 1396.

*B. Notice Requirements Were Satisfied.*

Parents have a due process right to reasonable notice of hearings at which their parental rights may be affected. (*In re Anna M.* (1997) 54 Cal.App.4th 463, 468.) In addition, California mandates the means by which notice must be effected for a section 366.26 hearing. Section 294 provides that once the juvenile court has made a finding that notice of a section 366.26 hearing has been properly given, notice of any continuance of the hearing may be made by oral advisement followed by first-class mail to the parent's usual place of residence or business, "or by any other means that the court determines is reasonably calculated, under any circumstance, to provide notice of the continued hearing." (§ 294, subd. (d).)

If the continuance is requested because the recommendation has changed "from the recommendation contained in the notice previously found to be proper" and the parent is present at the hearing at which the continuance is ordered, oral advisement followed by notice by "first-class mail to the parent's usual place of residence or business only" is permissible. (§ 294, subds. (d), (f)(1).) If, however, the parent is *not* present at the hearing at which the continuance is ordered, notice must be given by one of several specified methods. These include certified mail, return receipt requested, to the parent's last known mailing address; personal service; or delivering the notice to a competent person who is at least 18 years of age at the parent's usual place of residence or business, and thereafter mailing a copy to the parent named in the notice by first-class mail at the place where the notice was delivered. (§ 294, subds. (d), (f)(2)-(7).)

10

E. S. relies on a declaration she filed along with her notice of appeal to establish the factual basis of her claim that she did not receive notice of the continued section 366.26 hearing or of the change in the permanent plan recommendation. There, she stated that she received no notice of any hearing set after the hearing on April 3, 2012, and that although she asked her mother about the case, her mother did not inform her of any hearing date. She also stated that she did not live at her mother's residence, and although she was at the time sharing her mother's post office box, her mother had the only key.

Although the declaration is physically contained in the record on appeal, it is not properly a part of the record because it was not filed in the juvenile court as part of the proceedings leading to the judgment from which E. S. appeals. An appellate court cannot rely on documents which were not before the trial court, unless the appellate court can properly take judicial notice of the document. (*Doers v. Golden Gate Bridge etc. Dist.* (1979) 23 Cal.3d 180, 184-185 & fn. 1.) E. S.'s statement is hearsay and is not subject to judicial notice. Consequently, we must disregard it. Moreover, because appellate courts do not determine historical facts, except under exceptional circumstances, it is not within our province to make findings of fact based on evidence which was not before the trial court. (*In re Zeth S.* (2003) 31 Cal.4th 396, 405-407, 413-415 [appellate court may not consider postjudgment evidence in appeal from section 366.26 termination order].) Accordingly, we are limited to determining whether, on the record which is actually before us, substantial evidence supports the trial court's finding that mother was properly served.

11

The portions of the record which we can consider—i.e., everything except E. S.'s letter—support the juvenile court's implied finding that E. S. received effective notice of the hearing and of the subject of the hearing. We agree that the certified mail return receipt with the grandmother's signature does not satisfy section 294, even if E. S. was sharing her mother's post office box: Section 294, subdivision (f)(2) provides that notice by certified mail is sufficient if the agency receives a return receipt signed by the parent. We also agree that substituted service was not completed because, even if it was true that E. S. did live at her mother's home, the record does not show that the notice was thereafter mailed to E. S. at the grandmother's address, as required by section 294, subdivision (f)(4). (The certified mailing preceded the purported substituted service.) In any event, even though neither mode of attempted service satisfies section 294, due process may still be satisfied if the parent received actual notice. (*In re Phillip F.* (2000) 78 Cal.App.4th 250, 258-259.) E. S.'s attorney told the court that she had sent notice to mother's last known address. The court was of course entitled to accept her representation. In accordance with the ordinary presumption that a letter correctly addressed and properly mailed is presumed to have been received in the ordinary course of mail (Evid. Code, § 641), the attorney's representation constitutes substantial evidence on which the court could properly rely to conclude that E. S. did receive notice.[5]

---

[5] The attorney for CSF told the court that E. S. had been served by substituted service. That assertion, although no doubt made in good faith, was not correct because, as discussed above, substituted service was not effected in accordance with section 294, subdivision (f)(4).

Accordingly, viewed in the light most favorable to the judgment and to all inferences which the trial court might appropriately have drawn from the evidence (*In re Zeth S.*, *supra*, 31 Cal.4th at p. 405), the record supports the conclusion that E. S. received actual notice of the hearing on the changed permanent plan recommendation, and that her due process right to adequate notice was satisfied.[6] (See *In re Phillip F.*, *supra*, 78 Cal.App.4th at pp. 258-259.)

2.

LIMITED REMAND IS NECESSARY FOR FULL ICWA COMPLIANCE

E. S. informed CFS that she might have "Kiowa" ancestry through her mother. She later corrected her statement and informed CFS that she might have Cahuilla ancestry. CFS sent ICWA notices by certified mail to 10 Cahuilla tribes, and filed nine signed certified mail receipts, along with written responses from several tribes. No certified mail receipt or other response from the tenth tribe, the Santa Rosa Band of Mission Indians, was included. E. S. now contends that this omission requires reversal of the termination order. We agree.

ICWA establishes minimum standards, both procedural and substantive, governing the removal of Indian children from their families. (*In re H. A.* (2002) 103 Cal.App.4th

---

[6] The evidence that E. S. received actual notice is slight. However, an appellant bears the burden of producing a record which clearly demonstrates error. (*Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 Cal.4th 121, 132.) By failing to seek a hearing in the juvenile court at which she could produce admissible evidence that she was not served and did not receive sufficient actual notice to satisfy due process, E. S. has left us with no alternative but to conclude, based on the record before us, that the juvenile court properly found that she did received adequate notice.

1206, 1210.) An "Indian child" for purposes of ICWA means "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4); Welf. & Inst. Code, § 224.1, subd. (a).)[7]

ICWA seeks to protect the interests of Indian children and promotes the stability and security of Indian tribes and families. (*In re H. A.*, *supra*, 103 Cal.App.4th at p. 1210.) To effectuate that purpose, ICWA requires written notice, containing specified information, to be sent to any tribe in which the social services agency has reason to know that the child might be an Indian child. The notice must be sent by registered or certified mail, with return receipt requested, and the agency must file either the signed return receipt or a written response from the tribe in order to prove compliance. (*Id.* at pp. 1211, 1212-1213, 1215; 25 U.S.C. § 1912(a); Welf. & Inst. Code, § 224.2, subd. (c).)

We will remand the cause for the limited purpose of allowing CFS to complete its duties pursuant to ICWA. If CFS is unable to produce a signed certified mail receipt from the designated representative of the Santa Rosa Band of Mission Indians from its original mailing, it must renotice that tribe, and CFS and the court must proceed accordingly.[8] (See §§ 224-224.6.)

---

[7] Sections 224 through 224.6 implement ICWA.
[8] No one challenged the completeness of CFS's ICWA compliance in the juvenile court. It is conceivable that CFS did receive a certified mail receipt or a written response from the Santa Rosa Band but failed to attach it to its declaration of due diligence.

14

DISPOSITION

The order terminating parental rights is reversed and the cause is remanded. On remand, the juvenile court is directed to conduct a limited hearing to require the department of Children and Family Services to produce proof that the Santa Rosa Band of Mission Indians received proper notice under ICWA. Upon proof of proper notice and a determination by the Santa Rosa Band M. L. is ineligible for membership in the tribe, or if no response is received from the Santa Rosa Band within 60 days after the tribe's receipt of the notice (§ 224.3, subd. (e)(1), (3)), the court shall then reinstate its orders terminating parental rights. Alternatively, if the tribe determines that M. L. is a member or is eligible for membership, the court shall proceed pursuant to ICWA. (See § 224, subd. (c).)

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
J.

We concur:


RAMIREZ
P. J.


CODRINGTON
J.

15